The judges Desaussure, Waties, and James, being of a d Ufe rent opinion, Judge Desaussure delivered the following opinion and decree as the judgment of the court.
This cause was argued with great zeal and ability' by the counsel on both sides, to the great assistance of the court. As the case involved the discussion of many difficult points, and a vast property depended upon the decision, an unusual length of time has been taken by the judges in making up their opinions. In forming my own judgment, I have, gone deliberately over all the documents anti all the evidence, and I have examined all the decided cases quoted by the bar. I have also reflected on the arguments of the counsel, and deliberated long on the opinion pronounced by the circuit judge who tried the cause. The result has been a very clear and full conviction, which I shall proceed to state.
This suit was instituted by the complainants, who are the present appellants, and who are alledged to bo ignorant and necessitous men, in an humble condition of life, against the defeudant, who is stated to be an intglli- *679 .gent man, of great skill in the management of business, arid of high standing and influence in society. The object of it is to set aside certain contracts, for the sale of a large property, at a very inadequate price, on the ground that these contracts were obtained from them by the superior judgment and skill of the defendant, acting upon their ignorance and distress, when they were under the pressure of necessity : And also on the ground, that the defendant having been employed by the complainants and others, at a great price, to prosecute and establish their claims to the property in question, was their agent, enjoyed their confidence, obtained important information relative to their rights, and then obtained from them the contracts for the sale thereof on the inadequate terms complained of.
It appeared in evidence that the complainants were all in very narrow circumstances, illiterate and ignorant. One of them could not write his name •, another of them was addicted to drink, and nono of them were experienced in business. There was no pretence however of idiocy, or such extreme weakness in any of them, as to amount to legal incapacity to contract. They lived in the neighborhood of the defendant’s country residence, and they appeared to have had high confidence in him. The defendant himself was a man of judgment and experience, of considerable property, and of weight and consideration in society.
It appears that there were nine of the Butler family, brothers and sisters, who learnt sometime in the year '1801, that they were related to a Miss Margaret Butler, who was an idiot, possessed of a considerable estate near Georgetown, at the distance of nearly one hundred miles from them. George Butler, one of the brothers, who appears to have been the most intelligent among them, was employed to make enquiries into the nearness of their relationship to the idiot, and into the probability of establishing their claims. He seems to have acquired some information, and to have discovered some important witnesses 5 but he ivas ignorant of the proper method of pre- *680 ceeding’, and was discouraged by the little satisfactory progress he made in pursuing the claims.
In this state of discouragement two of the claimants met the defendant, and entered into conversation with him respecting their claims, and the little success which had • attended their exertions to establish them. The defendant thereupon advised them to employ some skilful person, who should be competent to manage the business, and bring it to a happy issue. The family seem to have been so much influenced by.his advice, that they resolved to pursue it: and as they knew no person so competent as he was, and in whom they had so much confidence, they determined to employ him in their behalf. Accordingly they applied to him, and after some negotiation an agreement was entered into, by which the claimants agreed to .allow him a tenth part of what might he recovered of Miss Butler’s estate, for his services in establishing their claims.
The first paper presented to the view of tho court was a letter from George Butler and George Barsh (who had married one of the sisters,) to the defendant, dated tho ,4th of February, 1804, in which they request him to act as the agent of the claimants, for-the purpose of perpetuating the evidence they were able to produce to establish their relationship to Peggy Butler of Waccamaw. They stated that they had been about two years flattered with the prospect of being heard before a court, and permitted to ¡¡rovo their relationship, but without effect. They added that their witnesses were very old, and they apprehended that further delay would endanger the loss of the property, which they stood much in need of | and they urged the defendant to lose no time in proceeding on their behalf.
The defendant says in his answer to the bill, that he agreed to the proposition 5 and on the 9th of April, 1804, a paper was signed by George Butler, Charles Butler, and William Sutler, which calls itself a memorandum of an agreement made between them and the defendant, though ,it was not signed by him. This paper was in the hand- „ writing of the defendant, and recites that whereas E. *681 Haskell bad rendered them certain services, they have agreed to compensate him for them by transferring to him and his heirs, whenever they or their heirs should come into possession of the estate in question, one-tenth part of all the estate of Peggy Butler, to which they should be entitled ; and they promised to execute such writings as might be required to give effect to the agreement: the said Has-kell first paying one-tenth part of all the charges which might accrue in establishing them the lawful heirs of the said estate.
Tiie defendant then went to Charleston, and ‘ had some communication with some agents formerly employed, and made some inquiries on the subject of the estate. On I) is return into the country, he entered into agreements with four of the Butlers for the purchase of their claims on the estate. One of the agreements was with Charles Butler, dated tho 23d of-June, 1804, in which (after reciting that it was believed that the .said Charles Butler, and his brothers and sisters, were as near, or the nearest of kin of Peggy Butler of Waccamaw, and that they would inherit the whole or part of her estate — but as this was uncertain, or, if true, it might be many years before the decease of Peggy Butler, and before any of them might get possession of her estate — and that he, being of opinion that in his circumstances it would be more for his interest and happiness to take a certain sum in hand, than to take the risques’ánd delays,) it was agreed that he, the said Charles Butler, should sell to E. Haskell all his rights, or those which his heirs might hereafter have, in and to the said estate, real and personal j and he promised to execute proper deeds to perfect the conveyance to said Haskell and his heirs, on condition that he should pay to the said Charles, on or before the first day of January then next ensuing, the sum of $200, and deliver him three African negro slaves, about fourteen years old ; and ’on the said Haskell’s getting possession of the estate, then he should pay to tbe said Charles §2,000 more, which should he in full, without any expense to the said Charles in prosecuting the claim. This paper also noted, that the said E. Haskell was made-acquainted with an agreement ¡made *682 ty and between the Butlers, that in the event of the death, 0j.“ ()11.„ or morc ()¡“ them before Uie death of Pea-ary Butler* the heirs or assignees ot the deceased should have ait ectua^ proportion of all the property inherited by the survivors. This paper was signed by Charles Butler and E.. Haskell, and witnessed by George .Butler and W. J. Myddlcton. A memorandum was added, signed by George,* Janies, and Thomas Butler, acknowledging the agreement respecting the survivorship, and consenting to Charles Butler’s transferring his rights to E. Haskell.
There are. receipts endorsed on the agreement, from June, 1804, till July, 1805, for successive payments of the g200, and of the three negroes ; and on the 1st of March, 1813, for major Haskell’s obligations for §2,000, signed by the executor of Charles Butler, who was dead.
James Butler on the 23d of June, and Thomas and "William Butler on the 9th of July, 1804, entered into precisely similar agreements with major Haskell, for the sale of their respective shares at the same price; on each of which was endorsed similar consent of some of the brothers, and with nearly similar receipts.
The strength of the. charge ailedged by the complainants in their bill lies here — that the defendant being the agent of the Butlers, possessed of all their information and papers, had opportunities of making- discoveries relative to their prospects of establishing the rights of the complainants ; and that availing himself of his knowledge* and of their entire confidence in him, and profiting by their necessities, he made purchases from them of their rights at most inadequate prices. The answer of the defendant, admitting the agency and the purchases from the complainants, denies that ho got perfect knowledge of the na-, ture and extent of the estate, and of the rights of the complainants in.his character of agent; anil that at the time he purchased the shares of four of the Butlers, he had not procured any further information on the subject from the time he had agreed to become the agent; that all the iiir ■formation he possessed he got from the brother, George Butler; that he had made no new discoveries, and the testimony had not been perpetuated aj tlije time of his pi@> *683 'chases. There appears to be some discrepancy between some, part of this answer and the agreement to allow the defendant a tenth part of what might be recovered of the estate of Peggy Butler : for that paper recites, that the allowance ol a tenth is agreed to he given on account or certain services rendered by the defendant to the complainants. What could those services have been, since the testimony was not yet perpetuated, but some essential discoveries as to their rights, and the proofs in sup-: port of them ? If this were, not the case, and the answer •states it so, then the language of the agreement is incorrect, and the great premium of a tenth part of the estate recovered might be impeached ; as was done in a case ■where similar services were said to he rendered, by the par-y’s assisting a poor and necessitous man in deducing his pedigree, and supporting his claims to an estate. See Proof vs. Hines. Cas. Temp. Talbot, p. 3. And nothing ean show in a more striking light the entire confidence reposed by the Butlers in the defendant, and their igno-'rar.ee and want of capacity, than their signing a paper, drawn up by the defendant in April, 1804, reciting that he liad rendered them services in relation to the Butler estate, for which they agree to allow him a tenth of their rights, though the amount was totally unknown to them, (but believed to be very considerable,) when the defendant himself states in his answer, that as late as June and July, 1804, he had made no discoveries, knew no more than what they had communicated to him, and had not perpetuated the testimony, consequently liad rendered no essential services. Another strong mark of the confidence reposed in the defendant by the complainants is their signature of the agreement for the sale of their interests in the estate, drawn up by the defendant, without any legal adviser, on their part, which has always been considered unfavorable to such contracts. See 2 P. Wms. 205, and 2 Schoales and Lefroy, 474. The reasons assigned in the deed for the sale are very unusual and seem to indicate'a suspicion that some excuse was requisite for so great an inequality. It is alledged that their claims were uncertain, and that many years might elapse before they could get *684 the benefit of them, and that it was better for them to have a certain sum in hand, than to run the risks and endürc the delays they must do. These expressions inserted in the agreements by the defendant indicate’ that ^.jic Qouipjainants were greatly discouraged in their hopes by the clouds thrown over them by some means ,• and it is not wonderful that they were discouraged, when a gentleman of intelligence and judgment, after being employed some months as an agent to investigate their rights, and to take measures to establish them, returns to them without having made any discoveries, and without giving them any encouragement. In this frame of their minds he becomes the purchaser, at a most inadequate price. It is to be lamented that judicious witnesses were not present at the discussion and settlement of the terms of the contracts. The witnesses do indeed prove the regular and voluntary execution of the deeds or papers; but they do not prove the discussions and representations which leil to them. And this is unfavorable to the defendant ; for the rule is quite clearythat in all cases of this kind, where a great advantage is gained in a contract by an agent from liis principal, the proof lies on him to show that the transactions were perfectly fair and pure. See 6 Vesey, 276 ; 9 Vesey, 369; 12 Vesey, 240.
It must bo remembered in the consideration of this question, that the rules at law' and in equity are quite distinct. That eminent chancellor, lord Hardwicke, says expressly, that this court will relieve against presumptive frauds; so that equity goes farther than the rule of law : for there fraud must be proved, and not presumed only — and that to take an advantage of a man’s necessity is as bad as to take advantage of his weakness — 1 Atk. 352 ; and lord chancellor Eldon agrees with him. He says, though there had been a strong inclination in Westminster Hall, in the time of lord Mansfield, persuaded to it by judge JBullcr, to say that whatever is equity ought to be law, this lias been reformed by lord Kenyon — and that the clear doctrine of lord Hardwicke and ail his predecessors Was, that there are many instances of fraud that *685 .Would affect instruments in equity, of which the. law could not take notice. See 1 Vesey, and Beames, 98.
It was insisted that the defendant had not sought or solicited the complainants, but that they had pressed the saloon him ; and this was relied upon'as a circumstance of much weight: more especially as it was said that offers were made to others of a similar nature. The proofs were not very distinct on this point, except as it related to one of the brothers ; and another of them swore that he was requested by the defendant to desire his brother to come to him, and sell him his share. But if the proofs had been unequivocal, it would not have been very conclusive ; for the offers to sell it to others at low prices might be the effect of their necessities.
A good deal of stress was laid upon the signatures of some of the brothers to the deeds by which the complainants agreed to transfer their rights to the defendant, either as witnesses, or as expressing their approbation of the bargain and the terms. And it was insisted that this was clear evidence of the fairness of the transaction. If these men had been intelligent or judicious men, this evidence would have had great weight; but they were generally illiterate, and they were all discouraged and hopeless ; and their judgment upon the subject before them does not seeni to be entitled to the high consideration attempted to be given to it. But certainly it does give the impression that they apprehended no fraud was practi-sing on their brothers who were selling their rights.
Again, great reliance was placed on the fact that the defendant had refused to purchase the share of John Butler, another of the brothers, who offered to sell his share at about the same price which the others got, as evidence that the defendant did not consider the bargain a great one : and undoubtedly it is presumptive evidence of that. But it is susceptible of the view taken of it on the other side, that by’refusing to make this purchase, the defendant expected to give a coloring of fairness to his other purchases. the great inadequacy of which might otherwise bring them into suspicion. On which of these principles the defendant acted, it is impossible for ns to determine *686 with absolute certainty' — that mast be. left to the Searcher of hearts.
It was further urged, that if the defendant had not become the purchaser at the price he gave, others might and probably would have purchased at even lower rates* But 1 do not conceive that because others might have availed themselves of the necessities or doubts of the Butlers, to obtain an unconscientious bargain from them, tliis would form any excuse for the defendant, more especially cloathed as he was with the character of an agent.
We will now proceed to consider whether the great inadequacy of the price alone, or coupled with other circumstances, does not furnish a ground from which the comt is bound to infer, that the bargain was too uncon-scieutious tobe supported in a court of equity ? That the inadequacy was very considerable appears from the com, parison ol‘ the price agreed to be given, and the amount of the value of the estate, and the shares the Butlers were entitled to. The defendant was to pay to the amount of gl ,200 for each share purchased, at all events, and £>2,000 in case of success. The amount of the estate, by the defendant’s exhibit II. was ¡$219,853, not including some expectancies. The defendant makes various deductions, which reduce the value of each share of the nine surviving Butlers tó about $11,372. My view of it would make each share worth, independant of the defendant’s transactions with them, about $12,630 : to which some additions were to be made, which would make each share worth from 13 to $14,000. This exceeds the price to be paid for each share more than fourfold. Great inadc-quecy of price lias every where been considered an evidence of unfairness in the contract, so as to induce the courts of justice to look upon such transactions with a very jealous eye. By the civil law, a sale was declared to be void if the property was sold for less than one half its value. The French code civil has adopted the Roman rule, but enlarged its- limits a little. The seller may obtain a recision of the contract of sale of real estate, not made at public auction, if the property was not sold for five twelfths of its value, even though he had expressly *687 J-’enounml, in. the contract of sale, the action for the rc-pision — See 4th vol. Cod. Civ. p. 370. Loi Relative a la Vente. Ch. 6. Sect. 2. Neither the English nor the American legislators have chought it adviseabie to lay down any precise rule on the- subject. It has been left, perhaps wisely, to the experience of the courts of justice to apply the great principles of equity to each case, according to its particular circumstances ; and thus gradually to form a practical system of pure justice. And the courts have, never decided, as a bread principle, that mere inadequacy of price, unconnected with direct fraud or imposition, or concealment, or advantage taken of extreme weakness, or great necessity, should be a distinct and independent ground of vitiating contracts. But the ■courts have said, that the inadequacy may he so gross as to furnish strong, and even conclusive, presumption of fraud ; and that in this way/thc grossness of the inadequacy may avoid the sale.
In comparing the inadequacy existing in the case under our consideration with the degrees of inadequacy existing in the. decided eases, it seems to come completely within that degree of gross inadequacy which furnished the presumption, a'nd vitiated the contracts. And I should therefore feel obliged by the authorities to pronounce, that the inadequacy was too great to be borne by a court of justice. But there can remain no doubt, when to a most gross inadequacy it is added, that the complainants were uneducated and ignorant men, in very narrow; and even necessitous circumstances, dealing in business out of their depth, with a very intelligent and experienced man, in whom they had great confidence. Í am not aware of any case, containing this combination of circumstances, in which relief lias not been given by the court, it will be/ seen, on an examination of the authorities, that the risk run by the defendant, and which was much relied upon to support the contract, has not been held to be sufficient for that purpose.
Before I go into a short examination of the decided cases, 1 will remark, that timer is a distinction made between tüq parses of young heirs selling expectancies aud *688 {>f 0[|ier persons, which I am not disposed to support. It is said that the former are watched with more jealousy, and more easily set aside than others, on principles of public policy. This was certainly true at first ,■ but the eminent men who have sat in chancery have gradually applied the great principles of equity, on which relief is granted, to every case where the dexterity of intelligent men liad obtained bargains at an enormous and uncon-scientious disproportion, from the ignorance, the weakness, or the necessities of others, whether young heirs or not. This just principle, the safeguard of society, and the tutelary genius of the court, watching over the imbecile and the needy, I adopt in all its extent. It is proper that there should be a perfect accordance between the principles of the contracts of the citizen, and the great principles of constitutional liberty which they enjoy. The former should be as puro as the latter are liberal and extensive. The only solid foundation for the liberty of the country is the virtue of the citizen.
Let us proceed to examine the decided cases, and sec their application to the one under our consideration. The first that I shall notice is that of Barney vs. Pitt, 2 Vernon, 14. The plaintiff was a young man entitled to a great estate on the death of his father, who was tenant for life. He got in debt, and borrowed 2,000L of the defendant, and entered into two judgments, of 5,0001. a-piecc, defcasanced that if the plaintiff outlived his father, and paid the defendant 5,000i. the defendant should vacate the judgment: and if the plaintiff did not outlive bis father, the money should not he repaid. The father lived four years; and complainant filed a bill to he relieved against the judgments, upon the payment of the 8,0001. and interest. The bill complained of fraud, and of the defendant working upon the plaintiff when in dis - tress. Relief was given on the ground of its being an -unconscionable bargain, though there was no proof of any practice used by the defendant, or any on his behalf, to draw the plaintiff into this security. See too 1 P. Wms. 318.
*689 fn the case of Knott vs. Hill, 2 Vern. 27, it was dc-tided, that the sale of an estate in remainder by a son who was in necessity, was void on account of the gross inadequacy, though the purchaser would have lost all if the son had died first. ■ The decree was affirmed on a rc-hear-ing, the lord chancellor declaring it was an unrighteous bargain in the beginning, and that nothing could help it.
In the case of Wiseman vs. Beake, 2 Vern. 121, relief was granted against a bargain on account of gross inadequacy, though the purchaser was to lose all if the seller did not survive his uncle, and get his estate. Wise-man Avas 40 years old, and an experienced man j and an offer hail been made to relinquish the bargain, which he had refused. The court said, that Avhen he had spent the money, then a specious offer was made to relinquish the bargain on payment of the money advanced, Avith interest, which at that time it was impossible for him to do-.
So too relief was given in the case of James vs. Oades, 2 Vern. 402, and of Ardglass vs. Muschamp, 1 Vern. 237. In the latter case the contingency relied upon, in support of the bargain, Avas held to be of no importance in such a case.
In the case of Stanhope vs. Toppe, 2 Bro. P. C. 188, lord chancellor Macclesfield gave relief against an advantageous bargain obtained by Stanhope from a person of weak understanding, though there was no direct proof of fraud ; and the answer denied all fraud : and the decree was affirmed on appeal.
In Twisleton vs. Griffith, 1 P. Wms. 310, lord chancellor Cowper set aside a contract, by which the defendant had got a good bargain from a young man who sold the reversion of an estate tail, his father being tenant for life, and an old man. The hazard run of losing the money paid, in case of the sou’s dying before his father, was not allowed to have any influence in the cause.
In the case of Curwen vs. Miller, lord chancellor King set aside a contract, on which an heir about 27 years of age borrowed 5001. on condition to pay 1,0001. if he survived his father and father-in-law. It atsb said *690 the bargain being hawked about, only shewed the nev ccssities of the party — See note C in 3 P. Wms. 292.
Lord chancellor Taibot gave relief in Bosanquet vs. Dash wood, in Forrester’s Reports, 37, though the party had submitted to the imposition from necessity for fourteen years. In that case, several decisions by lord chancellors Harcourt and King were referred to, in which it was declared, that relief would be. given against all offences against the law of nature and reason.
The case of Proof vs. Hines, Forrester p. 8, was a very important one. The plaintiff was a poor illiterate man, who was supposed to be entitled, to part of an estate | and lie applied to the defendant to assist him in making out his pedigree, and getting such proofs as wore necessary to make out his title to the estate. They advanced some small sums, and took some pains in the affair : and a bond for l,000i. was given, payable after the estate should be recovered. Lord chancellor Talbot- in giving relief said, that the bond was obtained from the plaintiff when under necessity,, and that the plaintiff's poverty is not to be omitted in such a case.
In Baugh vs. Price, decided in the exchequer, and reported in 5 Wilson, 320, relief was given, and actual conveyances set aside, though the inadequacy did not exceed one half the value. This is a very important case-.
In giving relief against a contract for the sale of a remainder in. tail, made by the remainder-man, who was in necessitous circumstances, at a very low rate, lord chancellor liardwicke said, that though the buyer might lose his money, if the remainder-man died before the tenant for life, this risk was immaterial; it was common ■in such transactions. Barnardiston vs. Lingard, 2 Atk. 133.
In Walmsly vs. Booth, 2 Atk. 25, lord Hardwickc gave relief against a bond obtained by an attorney from his client in distress, and reversed his first decree.
In the great case of Chesterfield vs. Janssen, 1 Atk. 301, lord chancellor Hardwicke made many important observations, explaining the doctrines of this Court, He said that the court relieves against all kinds of *691 fraud ; — that frauds may be either dolus malus, a clear And express fraud, or fraud ¡nay arise from circumstances, and the necessity of the person at the time. And there are also hard, unconscionable bargains, which have been construed fraudulent; and this court will relieve against presumptive fraud. To take advantage of another man’s necessity, is equally bad as taking advantage of his weakness. Fraud is presumed from the circumstances and condition of the parties ; weakness and necessity on one side, and extortion and avarice on the other — and merely from the intrinsic nncouscionablencss of the bargain.
The court liad previously given relief in the cases of Clarkson vs. Hanway — 2 P. Wms. 203. Lawley vs. Hooper — 3 Atk. 278.
We come now to the important case of Gwynne vs. Heaton, decided by lord Thurlow — See 1 Bro. C. C. p. 1. By this decision, the grant of a reversionary rent charge, after the death of the plaintiff’s father, who was old and infirm, upon unreasonable terms, was set aside $ though it was contended for the defendant, that he was mot a dealer in such transactions, and was invited into the bargain, and the terms deliberately settled by the plaintiff with his friends; the same terms having been offered to other persons : — also, that Gwynne was not an expensive young man, following his pleasures ; and this Was not like the case of a young man dependant on his father — that there was a contingency too, by which the defendant might iiave lost all his advances; and that the disproportion was not enormous — for if the lather had lived seven years, there could not have been any pretence of such inequality as the court would relieve against» So that it was reduced to the single question, whether this agreement was upon such an inadequate-consideration that this court will set it aside on that ground alone, there being no pretence of imposition. But ail these reasons were urged in vain, as it appeared that the consider ration was grossly inadequate, being, as was stated, three or four for one. — 'The lord chancellor said, the ground for relief was gross inequality — that the charges of fraud and oppression were not proved — that the vendor made *692 tbe offer to the. purchaser, who accepted it in the very shape it was offered, and did not Labor to lower the terms., ’ There was no confidence subsisting between the seller aiK* ^iC buyer; there was no misleading the judgment of the vendor, nor tampering with his poverty. On the other hand, said the lord chancellor, the terms are so very grossly inadequate, as to deserve all that has been said to be necessary to the setting the bargain aside. To set aside a conveyance, there must be an inequality so gross, strong, and manifest, that it must be impossible to state it to a man of common sense without producing an exclamation at the inequality of it. The chancellor then proceeds to take a masterly view of the decided cases, in which he shows that inadequacy alone cannot, as mere inadequacy, be made a ground for setting aside a contract ; yet it was, when very gross, a mark of fraud, and in that way would operate to vitiate the bargain. That was the ground in sir Thomas Mear’s case, cited in Forrester, p. 40. The case of Nott vs. Hill was clear of fraud, except what arose from the inequality. Lord Hardwicke treated gross inequality as a mark of fraud in many cases. Curwen vs. Miller was clear of direct fraud ; but the bargain was set aside, though the inequality was only two to one. In modern cases it is admitted, that the owners of reversionary interests arc as- complete to dispose of them as the owners of other interests, but with this qualification — rihat there is a policy in justice, protecting the person who lias the expectancy, and reducing him to the situation of an infant against the effects of his own conduct. The,court avows the disability, but not the length to which it disables. Its being hawked about is not an objection to the relief; it only shows the necessity the vendor was. under.
In thecase of Gartside vs. Itherwood, 1 Bro. C. C. 558, lord chancellor Thurlow again gave relief against a bargain obtained from a man of weak intellects, by his agent, on inadequate considerations, though the party came for relief seven years after the transactions. He said it used to he held, that a contract ought not to be set aside merely for inequality in the bargain, or merely upon the *693 ground of the weakness of the person selling $ but the court has since gone furtheiv — inadequacy is the basis of the relief; the thing to be inferred from the inadequacy is fraud — it is evitlohce of fraud,’ but for that purpose it must be gross.
In Heathcoat vs. Paignon, 2 Bro. C. C. 167, a purchase of an annuity was set aside, on the inadequacy, the purchaser haying given only two-fifths of the value. There was no apptHrancc of distress. The chancellor said that mere inadequacy, as a distinct ground, was scarcely sufficient. But, there was a difference between that and evidence arising from inadequacy. Lord chancellor Bedesdale in remarking on this,case said, he did not think that mere inadequacy was a sufficient ground to impeach a contract, unless very gross. — 2 Schoales and Lefroy, 395. In a note to the case of Heath vs. Paignon, that of Herne vs. Mears is stated, in which it appears that an inadequacy of half the value, and the distress the seller was in, induced the court to set aside the contract.' — See 2 Bro. C. C. 176, 7.
In Underhill vs. Horwood, 10 Vesey, 211, the lord chancellor Eldon stated, that if the terms arc so extremely inadequate, as to satisfy the conscience of the court that there must have been imposition, or that species of pressure on the party’s distress, which, in the view of this court, amounts to oppression, the court will order the instrument to be delivered up.
In Moftloke vs. Buller, 10 Vesey, 292, lord chancellor Eldon refused to decree specific execution of a contract for the sale of land, where the inadequacy did not exceed half the value, though there was no imputation on the conduct of the buyer; but the agent of the vendor had not communicated to him the survey and valuation, which would have shown him the true value.
Lord Alvanby refused to decree specific execution of a contract in a case clear of all fraud, where the inadequacy was very gross, being about half the value. — Day vs. Newman, 10 Vesey, 300.
In Tilley vs. Peers, decided in the court of exchequer, and stated by sir Samuel Romilly, 10 Vesey, 301, *694 the di i oí baron said, that laying out of consideration all circumstances of fraud, the court, upon the mere consideration of its being so hard a bargain, will not enforce it. Baron Thompson said, the plaintiff could not be assisted by the court, the consideration not being one -third of the value.
In Morse vs. Royal, 12 Vesey, 355, though the chancellor refused to set aside the contract, on the peculiar circumstances, said that gross inadequacy will go a great way to constitute fraud. In that case the vendor was anxious to sell, and pressed it on the purchaser. An intelligent relation of the vendor, and a trustee, concurred in the transaction. The seller veas not ignorant, weak, or necessitous. There was no imputation on the buyer. • There had been long acquiescence; and a confirmation made on receiving an additional price; and the buyer was dead, who might have explained many things. Yet lord chancellor Erskinc barely sustained the transaction, ami expressed his regret that the rule of policy had not barred more absolutely contracts between trustees ami their cestui que trust, as well as it did in some other cases, such as attornies and clients, trustees selling to themselves, &c.
In Lowther vs. Lowther, 13 Vesey, 103, lord chancellor Erskine agrees with his predecessors, that gross inequality is strong evidence of fraud. The dispropoiv iion was about six to one in that case.
In Pickett vs. Loggon, 14 Vesey, 214, 224, 243, lord chancellor Eldon gave relief to the plaintiffs, and set asido the agreements, and the formal conveyances, and even a fine, conveying the estate to tire defendant, upon-the ground of gross'inadequacy of price, (about one-fifth of the value,,) and the vendors being in distress, ignorant of their real interests and its value, and not properly protected by counsel, though a great lapse of time liad occurred. Sn this case the answer denied, that the plaintiffs were drawn in by any advantage taken of their ignorance or distress; and denied that the defendant was possessed of any informal ion which was withheld from the plaintiffs. The defendant also relied on the risk ran of losing the- *695 Whole purchase, if a nearer heii* should asnear ; and it was known that one formerly existed, though he had not been heard- from for many years. But this was not allowed to be any reason against the relief, according to lord Hardwicke’s opinion in Barnardiston vs. Lingood, 2 Atk. 133. The evidence in Pickett vs. Loggon stated, that the deeds were read and explained to the plaintiffs by the attornies, and they were made to understand the nature and value of the property. But they were in great poverty and distress; they were very ignorant people $ and though some description of the property was given in the deeds, it was not as full as it should have been. The price being so inadequate, the chancellor had no difficulty in giving the relief sought. This case is one of the most important that ever was decided ; and has great weight in settling and illustrating the doctrine as gradually developed by aseries of authorities. It has also many features of resemblance to the case now under our consideration-.
Purcell vs. Macnamara, 14 Vesey, 91, 110, was decided by lord chancellor Eldon, and afterwards by lord chancellor Erskine, assisted by the master of the rolls, conveyance should be set aside, in bargains cl-great inadequacy, on the nature of the deeds themselves, and the circumstances under which they were obtained, from feeble persons reposing confidence in the defendant.
The case of Murray vs. Palmer, 2 Schoales and Lefroy, 474, decided by lord Redesda'c, is in concurrence with the preceding cases. In that case the chancellor decided, that the conveyance of property obtained from a woman, in ignorance of the extent of her rights, and upon a misrepresentation of the circumstances of the property, should be set aside j though she was of full age, had consulted her friends, and had their assent; and she had received the interest on the purchase money for twelve years. The deed was prepared by the purchaser.
There have been few cases decided in our own court:! on this subject. Speculations of this kind do not appear have been frequent; and it is to be hoped that the do- *696 cisión of the court will be calculated to restrain them altogether.
The first of the cases occurring in our courts was that of Clitherall vs. O gil vie, in the year 1792, in which the plaintiff filed a bill for the spocifit performance of an agreement for the sale of a very valuable plantation, of which the defendant and his brother were joint owners. The defendant refused to comply, on the ground that the land was worth three times as much as the agreement stipulated to give; that the defendant Ivas a young man inexperienced, just of age, ignorant of tho value of the land, and rather importuned by the plaintiff, who was an experienced man, and well acquainted with the nature and value of the land. The court decreed against the plaintiff, and dismissed his bill with costs. The judges said that though inadequacy alone is not a sufficient ground to set aside a contract, yet, if gross and palpable, the court will not lend its aid to enforce it ; that the inadequacy was enormous, the defendant was young and inexperienced, ignorant of the value of the. property, was rather too much importuned into the bargain, and had included in the agreement his brother’s half of the land, ■which he had no authority to sell; and that under these circumstances, though there was no direct fraud proved, the court would not decree a specific performance.
The case of Gregor and others vs. Duncan and others, was decreed in May, 1808. The court refused to set aside the contract, though tho price was enormously inadequate. The court said that there was not a tittle of fraud in the case; that the complainants were of full age, competent to transact their business; were as well informed of their rights anti interests as the defendant was, and probably better: for they had an intelligent attorney in this country, who doubtless informed them of their rights, and the value of the property ; and there was no sort of concealment on the part of the defendant — mid it appears from the case, that there was no relationship or confidence, subsisting between the parties. The court also added, that mere inadequacy of price is not a ground to set aside agreements, executory or executed : and it seemed to *697 lay' some stress on the ground that if the purchase had turned out to be a lósing one, the court would not have relieved; and therefore the court ought not to relieve when it was an advantageous bargain. I am not quite satisfied with either of these positions | and am inclined to think, that relief would be given tó a purchaser as well as to the vendor^ on a proper case made out— though there arc strong reasons why the court would relieve vendors, even if it did not the buyers.
The case of Bunch vs. Hurst, decided in the year 1811, and affirmed by the court of appeals, was not decided on the ground of mere inadequacy alone, though that was enormous ; but the bargain was obtained from a poor creature, who was nearly an idiot, though capable of the common transactions of life.
After this long examination of the decided cases, which form precedents to assist our judgment, I come sow to the results, and'the application of them.
I consider the result of the great body of the cases to he, that whereever the court perceives that a salé of property lias been made at a grossly inadequate price, such as would shock a correct mind, this inadequacy furnishes a strong, and in general a conclusive, presumption, though there be no direct proof of fraud, tliat an undue advantage has been taken of the ignorance, the weakness, or the distress and necessity of the vendor : and this imposes on the purchaser a necessity to remove this violent‘presumption by the clearest evidence of the fairness of his conduct; and the relief is given by the court, either by refusing to enforce the contract, or by setting it aside altogether, according to the circumstances of the case. The relief is extended not only to young heirs selling their expectancies; but to all who arc weak, or necessitous, or not perfectly conusant of their rights, whether selling expectancies or absolute estates; more especially where the purchaser is very intelligent and acute, and avails himself of his superiority in an unreasonable manner. And the answer of the defendant denying fraud in the transaction, though entitled to much weight, is by no means conclusive : hut the Court gives relief on strong *698 counter testimony, or on the great intrinsic evidence iff gross inadequacy, coupled with other circumstances, such as weakness or necessity in the seller, confidence-reposed in the buyer, &c. And the decided cases further shew that the hazard run by the buyer of losing - hat he advances on some contingency, does not prevent the Court from giving relief 5 nor have specious offers to rescind the bargain, when the injured party could not refund the money, blinded the eyes of the Court to the real nature of the transaction.
In the case under our consideration, we have seen that the price was grossly inadequate $ at least ten for one •of the money actually paid on the risk, (if indeed there were any risk,) and four for one of the whole sum to be paid when the estate should be recovered. This inadequacy is greater than in many of the cases in which the Court gave relief.
It was relied upon for the defendant, that this great inadequacy was unknown at the time to the buyer as v ell as the seller. But if tin's were established, it would not alter the case under the circumstances. For it was known that the estate was very large ; and it was quite easy for Ihe defendant to have ascertained with some accuracy the value of the estate ; and it was his duty, as the agent of the plaintiffs, to have done so. Besides, this mode of purchasing in the gross, without schedule, or description, or valuation, is itself objectionable; and is a feature in the cases, which has strongly led the Court to give relief, especially to weak or necessitous men. It appears further, that the sellers were uneducated and ignorant men — one of them could not write, and none of them had any experience in business — none of them appear to have had any accurate ideas of the value of the property, though they vaguely thought it large; and they were at a loss as to the mode of pursuing their claims. George Butler, who was said to be the most intelligent of the brothers, was baffled and despondent.. The sellers were also in narrow circumstances and necessitous. One of them could not- raise about thirty dollars to pay his proportion of a counsel fee. None of *699 ■them were wealthy. It seems also, that the purchaser was a gentleman of acute understanding, great experience in business, and much knowledge of men and things, and that he knew the defendants, their situation in life, 'their necessities and their incapacity to cany on their own claims to the estate. And above all, the defendant seems to have had their entire confidence, for they signed all the papers which he drew in their various transactions without ever resorting to counsel. Their necessity and their incapacity to conduct their business, is proved conclusively by all the family consenting to give a tenth part of the estate recovered, to an agent to pursue and establish their claims. Their confidence in the defendant is demonstrated by their selection of him for that agency.
It does appear to me that these circumstances, connected with the great inadequacy of price, are conclusive; and that the Court is imperiously bound to give the relief sought by the complainants’ bill. Much reliance was placed by the defendant’s counsel on the ground that the purchaser ran a great risk of losing his advances of $1,200 to each of the vendors. We have seen by the decided cases that this risk would not in such a case have varied the decision of the Court — .but the risk in this case was really small. The interests of the vendors, whatever they were, could not be shaken, for the estate was the property of a person, pronounced by a jury of inquest to be an idiot; consequently she could neither marry nor alienate her estate by deed or will, or burthen it in any way. Her expenses were necessarily small, and a surplus income was annually put out to interest. The vendors claimed as next of kin, and the chance of any one of them not surviving her, was at least equal, and the chance of a majority of them surviving her more than equal; and the Butlers had entered into a written agreement (of which the defendant was let in to the benefit) that if any one of them should die before the idiot, his representatives should he let in equally with the survivors.
The defendant’s counsel also relied on the risk of not being able to establish the claim by proving the rela--. *700 tionship to the idiot by any evidence ; and of not being able to perpetuate the testimony in the case. But these risks do not appear to have been great, and were all overcome. The defendant states in his ans.wer that the Butlers had furnished him with the names of the material witnesses, to establish, by their testimony, their relationship,* and it seems that this testimony did chiefly establish their claims on the trial. As to the testimony, it was perpetuated in duo form without difficulty, and received on the trial. But it is stated that it was received by consent, and that if it had been resisted, it would have been refused by the Court under the decided cases ,* and that Eepulfc, the principal witness, whose testimony had been taken, was actually dead at the timo of the trial. I do not however agree, that this testimony was improperly perpetuated, and might have been rejected, it was not ■ opposed, and therefore the judge received it and gave no opinion on ¡the point, if it had .been argued, it would have been found that though the rule may .be, as stated, that the interest which the next of kin of a lunatic has in his property, is not sufficient to support a bill to perpetiir ate testimony; yet there is a modification of the rule which enables parties interested to obviate the difficulty. For it is laid down that the next of kin of a lunatic, or an heir at law, may enter into contracts with respect to their expectancies ; the evidence upon which they might perpetuate j for the law would frame an interest in respect of the contract; and with respect to that they would have a right to perpetuate testimony, though they could not as to any interest in the subject itself. See Cooper’s Equity Pleadings, 54, 5 ; and Lord Eldon’s opinion in Dursly, vs. Fitzharding, 6 Vescy 261. And in fact, the Butlers had actually placed themselves in that very situation by their contract to let in the defendant to one tenth of the property of the idiot, to which they might be .entitled ; and this was raising such an interest as would have enabled them to perpetuate the testimony.
Some stress was laid on the labor, time, trouble and expense bestowed by the defendant in the prosecution of the claims, as a set-off against the inadequacy of the *701 price, all which would b,e lost if he did not succeed. But the defendant bad stipulated for a tenth part of the claim of all the nine Butlers, as a reward for his agency, his time, his trouble and his labor in the pursuit of their claims, and therefore these cannot be placed to his account in his absolute purchase of their'rights. He was bound to do as much under the first contract for the tenth, as he afterwards did under the contract for the whole of the four shares he purchased.
There is one other feature in this case which has struck my mind very forcibly as evidence of the want of sound understanding and capacity in the Butlers, and that they were as ignorant and weak as they were necessitous. When the decree of the Court had established their relationship to the idiot, and their claims to nine fifteenths of her estate, they were called upon to execute other papers and deeds, to complete the transfer of their rights to the defendant. And so little did they understand their rights, and what they were bound to do, that they were induced by the defendant to prevail on their wives to renounce their dower in the valuable lands of the estate, without any new consideration, although the contract for the sale did not stipulate for the renunciation of dower. And they all joined in the execution of deeds prepared by the defendant without the plaintiffs’ having the benefit of counsel.
It was insisted, that the offer of the defendant to the complainants, on the death of Miss Butler, to rescind the contracts, on their repaying him the $1,200 a piece, which he had advanced them, was conclusive evidence of the fairness of the conduct of the defendant to them. Undoubtedly it is calculated to give that impression, but it is very far from being conclusive. We have no evidence of the manner and circumstances of the offer— Whether they were to refund the advances immediately or to have time given to them to do so. The certificate of the offer says the money was to be first repaid-. They were not in better circumstances than when their necessities obliged them to sell, nor coukl they repay him his advances. They were under the same necessity that they *702 were at first, and they were compelled to ,go on as they had begun. Of their real situation the defendant could . , \ , not be ignorant.
Upon the whole, after long and mature deliberation* A. . „ , . ... my opinion is firmly made up that the inadequacy m this case was so gross, and the ignorance and necessities of the parties selling their rights so great, that the court is bound to set aside the contract.
There is also anotiicr ground of very great importance in this cause, on which I rely in forming my judgment. The defendant was, at the very time of his purchase of the rights and interests of the complainants, their agent and trustee, to take care of those very interests’, and support those rights, for which he was to receive a very large compensation.
It is quite unnecessary to multiply authorities to jprovc that his agency made him a trustee. It is laid down, as an universal maxim in Legará & Hodges, 1 Vesey, jun. 478, by lord chancellor Thurlow, that whereever persons agree concerning any particular subject, that, in a Court of Equity, raises a trust, as against the party himself, and any claiming under him voluntarily or without notice.
But whether his agency precluded the defendant from becoming the purchaser from the Butlers, under ■any circumstances however fair, is a question of considerable difficulty. There seems to be two classes of decided cases on this subject; one where the relation of the parties is such that no contract can be permitted to subsist on any terms, if sought to be relieved against, as the case, of attornies dealing with their clients, or trustees selling to themselves : the other where the relation of the parties does not interdict all contracts on the subject of the trust, but where a confidence being reposed, the court looks with a jealous eye at the conduct of the. agent, and will set aside the contract, if there bo any considerable inadequacy of price in the transaction; and the more especially if there be any Weakness or necessity in the vendor*
*703 The decided cases will illustrate the doctrine and 'the distinctions. In Gartside v. Itherwood. See 1 Bro. C. C. 558, the lord chancellor decided that leases for lives obtained by agents from a person of weak intellects, on inadequate considerations, should be set aside. He referred to the case of Filmer v. Gott, 7 Bro. P. C. 70, as supportable on the principle that a confidence was-reposed, and that confidence abused, by obtaining an advantageous purchase from the principal. And he added, that fraud may be collected from gross inequality ; especially if one of the parties employed and confided in the other, or was pressed by necessities which made him more readily give way to the other.
The case of Fox v. Mackreth, 2 Bro. C. C. 400, was one of the most contested causes ever tried in the English courts. It was there decided, that an agent or trustee, for the sale of an estate cannot become the purchaser, at any rate,; and on his making a profit of only twenty per cent, on a resale, he was compelled to account for it to his principal. Mr. Fox was a young man, but there was no pretence of weakness — 'the estate was absolutely his own, and though his estate was greatly encumbered, and he was therefore necessitous, he had an immense estate. He reposed confidence in the agent to make a good sale. There was no proof of any direct fraud, and Fox had signed the. agreements most deliberately, after twenty-two days’ reflection, and he had a valuation of the estate in his own hands, made by his own agent. The master of the roils, the lord chancellor Thurlow, and the house of lords, successively decided, that the contract could not be supported, and that the agent must account for the profit made on Ms purchase.
In the case of Crow v. Ballard, 3 Bro. C. C. 117, it was decided, that an agent employed to sell a contingent legacy, and buying it in for himself, though in the name of another, the contract was void, though the gain of the agent was less than half the amount. The agent could not be permitted to be the buyer and the seller, oven if the .sale had been perfectly fair.
*704 In Gibson v. Jeyes, 6 Vesey, 266, 271, it wag decided, that the sale of an annuity by an attorney to his client should be set aside. The disproportion was considerable, but not so great as- necessarily to involve ° ** fraud ; but there was a confidence in one party, and a gain made by him which could not he supported. There was some imbecility in the party, but she knew what she was about. The lord chancellor said he did not mean to contradict the cases of trustees buying of their cestui que trust — but then the confidence in the party must be withdrawn, and the relation changed. It is a great rule, of the court, that he who bargains in a matter of advantage, with a person placing confidence in him, is bound to show that a reasonable use has been made of that confidence.
In the case of Coles v. Trecothick, 9 Vesey, 234, 244, the same doctrine is laid down. A trustee may purchase. of his cestui que trust; but he must have divested himself of the character of agent or trustee, and he must prove the utmost fair dealing. The same doctrine is in 10 Vesey, 385, exparte Bennet.
In Morse v. Royal, 12 Vesey, 371, lord chancellor Erskine stated the law of the court to he clear, that certain contracts may be avoided as being contrary to the policy of the law — such as gifts obtained by an attorney whilst engaged in the business of the donor: a deed by an heir just of age to his guardian; trustees selling to themselves ; purchasers of reversions from' young heirs; and assignees or solicitors under a commission of bankruptcy. In all these the contract is void by reason of the relation of the parties, or the policy of the law; and he added, that he should have been glad to have added to this list the case of trustees purchasing from the cestui quo trust. He thought the difficulty was so great for a trustee to make out a case where the purchase at a low price could be supported, that it would have been better to have embraced that class of cases under the rule; but the rule had not been carried so far. In fact, the rule is so rigorous in requiring demonstrative proof that the confidence has not been abused, where *705 tbs trustee becomes the purchaser from the cestui que use, that it seems almost impossible for him to do so ; and very few have ever been able to do it. It would therefore be wiser to shut the door altogether, and to exclude all such contracts absolutely, as has in reality been done by some of the cases.
Again, in Lowther v. Lowther, 13 Vesey, 95, lord chancellor Erskine recognizes the principle, that an agent to sell shall not convert himself into a purchaser, unless he can make it perfectly clear that lie furnished his principal with all the knowledge he possessed; and that groáó inadequacy is strong evidence of fraud.
The case of Purcell v. Macnamara is a very important one — See 14 Vesey, 91, 107. It was decided, first by lord Eldon, and afterwards affirmed by lord chancellor Erskine, assisted by the master of the rolls, who delivered a most elaborate and luminous opinion. It was deci’eed, that the deeds complaint d of should be set aside, upon the nature of the deeds themselves, the circumstances under which they were obtained, and the confidential relation of the person by whom obtained.
I am hound then to say, that if the agent in the case under consideration was at liberty to become a purchaser from his cestui que use, under any circumstances, however fair, it is incumbent on him to shew demonstratively that he had not abused the trust reposed in him; that he had given all possible information to 3ns employers ; that he had enlightened them as to their interests ,• and had advised them as he would have done against a third person, offering to become the purchaser at such an enormously inadequate price $ and some of the authorities say the connection should have been entirely dissolved ; and that he had given a fair price for the property. Instead of this the contract was made whilst the agency subsisted. It is not made out in proof that the agency was at an end at the time of the contract; or that he advised the principals as he would have done against a stranger; or that he gave, any thing like a full price for the property in question. It does appear *706 to me therefore, that the contracts cannot be sustained and that this Court is bound to give relief against them.
But it was insisted for the defendant, that whatever may have been the character of the original transaction» the various acts of acquiescence and confirmation by the complainants, bound them completely, and rendered it improper for this Court to interfere. This point deserves particular consideration, because it was on this ground that the Judge, who tried the cause on the circuit, decided in favor of the defendant, and 1 have long paused on it.
Acquiescence from the time of the original contract in 1804, to the time of filing the bill in this cause, ivas relied upon by the counsel. It will be remembered, however, that the idiot neier died till the year 1809; and that the absolute rights of the complainants did not accrue till that event. And that is the true time, from which the acquiescence should be reckoned. But count from either date, the time of the contract, or of the death, of the idiot, the acquiescence, as it is called, does not' exceed the time in many cases in which relief was given. In Walsmley vs. Booth, 2. Atk. 25, lord chancellor Hardwicke relieved the representative, after six years’ acquiescence by the party aggrieved, who died without seeking relief. In Gartside vs. Itherwood, lord Thurlow relieved after seven years’ acquiescence, from the time the right accrued.
In Beaumont vs. Boultbee, 5, Vesey, 485, the Chancellor relieved, after many years’ delay, in the case of an agent, in whom confidence had been placed; stating that though lapse of time might he a good objection for others, it was not so for one so situated. And lord Eldon affirm* ed this decree on a rehearing- 7 Vesey, 599.
In Purcell vs. Macnamara, 14 Vesey, 91, lord Eldon gave relief after 14 years had elapsed, though the deeds were solemn, and repeatedly acknowledged.
So in Pickett vs. Loggon, 14 Vesey, 214, relief was given 12 years after the transaction. And in Murray vs. Palmer, 2. Schoales & Lefrov, 474, after 12 years. In Hatch vs. Hatch, 9 Vesey 292, after 20 years; and *707 in Deloraine vs. Brown, after 20 years. Thus we per-eeivr that mere laj)se of time will not bar a claim, otherwise good, unless it be so extremo as to furnish very strong presumptions against the claim $ which the Court will attend to more readily, if some of the witnesses or the party whose acts are impeached, are dead; as was done in the case of Morse vs. Royal, in 12 Vesey, 355. That being one of the very few cases in which the pur-«hase of a trustee from his cestui que use, at an inadequate price, was supported ; for the acquiescence had been long, and there had been a full confirmation (on an increased price) by a gentleman of full age and sound understanding, deliberately made, not in necessitous circumstances» and not at all ignorant of bis lights, and the trustee was dead, who, if living, might have explained many things.
We come now to the consideration of the direct acts of the plaintiffs, which are relied upon by the defendant, _ as amounting to a confirmation.
The first paper relied upon, is signed by William, James and Thomas Butler. The first of them signing hy a cross or mark. Charles Butler was dead. The paper bears no date, but it was signed after the decree at Georgetown, in February 1813, for it refers to that decree. It then recites or declares, that the defendant did, soon after the death of Margaret Butler, the idiot, offer to each of them, to give up their respective contracts or agreements, for the sale of their shares, upon, returning him the property he had paid, and releasing him, &c. And it is added, that they had disagreed to the offer, being well satisfied with the contract, let the event prove as it might.
I confess it does not appear to me, after full consideration, that this paper is at all calculated to strengthen the defendants’ case, in any point of view, either as affording evidence of the fairness of the transactions, or directly as an act of confirmation.
The declaration obtained from the plaintiffs, and couched in the defendant’s own wrords, he being the penman, was signed several years after the verbal offer *708 was said to have been made. It seems not to have bceta called for; but to bo obtained to support transactions,. the fairness of winch might be questionable. It is sign-e<^ a^so two witnesses, but no evidence is given, that at the time of the offer made the defendant explained to the complainants the true situation of affairs; that the death of Miss Butler had opened the door to the speedy establishment of their rights j that the testimony had. been perpetuated which it was believed would establish their claims ; that the property was immense; and that it was greatly their interest to accept such an offer. — ■ There is no evidence that the defendant, knowing as he did, their poverty and necessity to be still bearing hard on them, and rendered them incapable of returning the money advanced by defendant, offered them to forbear his demand for reimbursement, till they should recover their property. On the contrary, the paper states that tho offer was made, provided they would return the money | which, it was well known, it was out of their power to do. Such an offer was exactly what the decided cases, we have seen, call a specious one; which the party knew could not be complied with. And an offer like this, relied upon as an act of confirmation, in a case not sustainable on its original ground, ought to be supported by the clearest and strongest proofs of the utmost purity and good faith. It should not have the appearance of being an illusory act, done, not to give the other party an advantage, but to bind faster on them the chains already twisted round them. The signature of such a paper drawn up by the defendant, at such a time, shews the continued confidence reposed, and the continued influence which governed the Butlers through all these transactions.
But the great reliance of the defendant’s counsel was on the deeds executed by the three Butlers, in February and March 1813, which are called deeds of confirmation. These deeds refer to the decree which was delivered at Georgetown, early in February 1813, which established the rights of the Butlers. They'recite the agreement in June 1804, by which four of the Butlers contracted f» *709 transfer their rights to the defendant; and that, in pursuance of that contract, they severally transfer and convey their shares of the estate in question to the defendant. These deeds were executed in the presence of respectable witnesses, who prove that the deeds were explained to the plaintiffs. But there is no evidence that tiie Butlei*s were more enlightened or less necessitous than they were originally. There is no evidence that they were informed that their rights being established, and no appeal made, each share of the estate was worth from 12 to 14,000 dollars. It is not pretended that these men were informed that they were free to confirm the original contracts or not; and that the original transaction not being sustainable at law or in Equity, they could be relieved from it. On the contrary, they seem to have gone on, under a persuasion that they were so bound by the original contracts that they could not be relieved; and they therefore executed any papers drawn up and presented to them by the defendant, in order to get the stipulated price.
That the complainants thought themselves legally bound to go on, appears by the wording of the deeds, and they allege the fact in their bill. The defendant in bis answer admits, that they thought themselves bound-, both legally and fairly. Now I understand the doctrine,* as to confirmations, to be quite settled, that the party who gives them must be shewn to be no longer under those circumstances of necessity, or of overbearing influence, or blind confidence, which led into the first agreement; and that he is aware that he is not bound by the original contract, but may be released from it; but that nevertheless he chooses deliberately, and without imposition, to confirm what he had first done. To this it must be added, that in many cases, particularly of great abuses of confidence, confirmations are not allowed to have any effect. A short examination of the decided cases will illustrate the doctrine.
In Ardglass vs. Muschamp, 1 Vern. 237, a release' and confirmation were decided to be of no avail, in a ■case of great inadequacy, and imposition on a weak mam *710 Tlie loud keeper hesitated at first about interfering will* contracts, however unjust; but upon searching for pre* cedents, from tlie time of lord Bacon, he became satisfied, and, after two re-hearings, decreed that the contract, though executed and confirmed, should be set aside-adding emphatically, that if he were to dio immediately he would make that decree. So in Ardglass vs. Pitt, 1 Vern. 439.
In Wiseman vs. Beake, 2 Vern. 121, the court relieved against an uncouscicntions bargain, by which the plaintiff, aremaimh r-man, had agreed to pay ten for one of the money advanced, if his uncle, who was tenant for' life, with remainder to his issue male, should die without -such issue in the life-time of the seller. The vendor was a man of thirty years of age, trained to business, anil not «’(-ak ; but he was necessitous, and the price grossly inadequate. The confirmation in this case was of the strongest kind ; for the defendant Beake had filed a bill, in the uncle’s life-time, against the plaintiff Wiseman, to compel him to repay the money advanced with interest, or to be foreclosed from relief against the bargain; and in his answer thereto he said, that he elected to stand by the bargain, which had been fairly made, and that he would not seek any relief against it — -and this confirmation was relied on. But the court said, that when he had spent the money, a specious offer was made him to relinquish the bargain, on payment of principal and interest, which it was impossible for him to do, and that this was a contrivance to double-hatch the cheat; and the court set aside the contract.
In this case there was no pretence of weakness in the plaintiff, or imposition practised on him; nor was he a young heir. But he was necessitous, and selling an expectancy at a most inadequate price. This was considered conclusiveand the confirmation made whilst the necessity lasted, was of no avail.
In Taylor vs. Rochford, 2 Vesey, sen. 281, 2, the court of exchequer decided that a bargain of about three for -¡lie was anconscicntous, and should be set aside. The vendor was a poor ignorant sailor, selling his primar *711 íttoney. A very deiib. rate r<.:dU*m«Om vv.ih set aside, and the court said that confirmations though made over and over again, would be broken through, if they were not obtained property. ."
In the case of Stanhope vs. Toppe, 2 Bro. P. C. 183, the lord chancellor Macclesfield decreed, that deeds obtained by artifice, (though no direct proof of fraud,) from a weak man, who confided in the other party, should be set aside; notwithstanding a subsequent release, and notwithstanding the answer denied fraud. The decree was affirmed on appeal.
Baugh vs. Price, 3 Wilson’s Reports, w as decided by the court of exchequer ; and it was decreed, that several successive articles, deeds and conveyances should be set aside. It was the case of an attorney, who purchased an estate for half its value, from a man who was tenant in tail in remainder, (his father being tenant for life, but old and infirm,) and in necessitous circumstances. The attorney had been previously employed, confidentially, by the family. He drew the deeds himself, and the other party had no council or attorney concerned for him. It was relied upon for the defendant, that letters from the vendor to defendant, written after his father’s death, shewed that he thought the bargain a fair one; but the court said that the letters were written soon after his father’s death, before his eyes were open, and before he knew the real value of the estate. Reliance was also placed on this, that the party alleged to be injured, had filed a bill after his father’s death to be relieved,' and defendant liad put in an answer denying the fraud charged ; and afterwards the plaintiff* consented the bill should be stopped, and he then executed a deed reciting that the purchase was a fair one, and he confirmed and released the premises to the vendee — and the party lived several years, without ever questioning the last transactions. But the court said that under the circumstances of the case, the release and con* firmation could not be supported : for the party was never fully apprised of his rights. The whole transaction was set aside? though the party was of competent ago *712 capable of - transacting ordinary business* not at ail-intoxicated. But he was in necessitous circumstances, and bad confidence in the other party. In Walmsley vs. Booth, 2 Atk. 25, lord Hardwiclce on a re-liearing, disregarded an acquiescence of six years by the party aggrieved, and by his representative, who allowed a judgment to be obtained on the bond, improperly obtained; and the chancellor set aside the bond and judgment. At the first hearing the lord chancellor refused to interfere, but on a re-hearing he used these words, so honorable to his candor. “ Upon the case being re-argued and rc-considered, I am thoroughly convinced that my former decree was wrong.” In that case there was no weakness, but the man was in distressing circumstances.
In the celebrated case of Fox vs. Mackreth, 2 Bro. C. C. 400, decided by lord chancellor Thurlow, affirming a decree of the master of the rolls, it was decreed, that several successive deeds amounting to recognitions, and intended to operate as confirmations, should not he binding on the party who made them $ over whom an advantage had been gained by another person, in whom he had confidence, and had employed him to sell his property. The advantage gained was not above one fifth of the value of the property, and there was no direct proof of fraud : which was also denied by the answer. The lord chancellor said the executing the subsequent deeds, did not amount to a confirmation, “ as it was done without any knowledge in Fox, that he could impeach the transaction and he cited the cases of Baugh vs. Price, Taylor vs. Rochford, and Cole vs. Gibson, 1 Vesey, sen. 503. In this case of Fox vs. Mackreth, a distinction was taken, which was important. It was stated that in the case of Janssen vs. Chesterfield and others, in which confirmations had been supported, there were clear acts of'confirmation. But that in Fox’s case, the parties executing the second deeds were only carrying into effect the original contract, (vide p. 419) ; and that the execution of the duplicates shewed how much Fox: was in tlie power of Mackreth,. It was done foA *713 the purpose of getting something which might be called an act of confirmation — and Fox did not think he had not been fairly dealt with, for several years after the transactions. So, in the case under our consideration, the execution of the papers, after the decree, now relied upon as acts of confirmation, were not intended as acts of confirmation, but as an execution of the original articles of agreement. The defendant expressly says, that neither lie nor the plaintiffs thought an act of confirmation necessary to give validity to the agreement 5 for' •that they thought themselves already bound.
In Crow vs. Ballard, 3 Bro. C. C. 117, 118, and I Vescy, jun. 220, the lord chancellor refused to permit a confirmation to prevail, though made with such deliberation that one of the most eminent counsel arguing for the defendant said, “ if the confirmation in this case does not prevail, there never can be a confirmation.” But the lord chancellor said, if a person, conceiving he has made a hard bargain, and knowing that the bond is bad, will give a new bond, that will maintain the right of the holder, and that shall be a good confirmation ; “ but not any act done under the influence of the former transaction, and under the opinion that that bond is good.” That the bond was given under the influence of the former' transaction, arid the payment of interest on it, is of no avail, being still under the same impression. Surely this was precisely the case of the plaintiffs, the Butlers. They believed themselves bound, and signed any papers presented to them; and such acts cannot amount to confirmations.
In Deloraine vs. Brown and other's, 3 Bro. C. C. 633, which was the last case decided by lord chancellor Thurlow, tire hill charged fraud. A demurrer was put in on tire ground that the transaction had been confirmed by deed twenty-three years since. But the chancellor* disallowed the demurrer. He said it did not appear that the complainant was undeceived at the time of the confirmation, which was made whilst the party remained in the same distress that he was originally. But he algo *714 disallowed the demurrer, because proprio juro, length 6f time was no reason for a demurrer.
The case of Purcell vs. Macnamara was decided by-lord Eldon, and afterwards by lord chancellor Ers-kine, assisted by the Master of the Rolls. It was decided and affirmed that several deeds executed at large intervals, should not prevail as confirmations ; the other party being throughout under the same influence, control and ignorance of their rights; and every instrument signed under the same blind confidence.
In Picket vs. Loggon, 14 Vesey, 214, conveyances,, releases, and even a fine, were set aside on great inadequacy, combined with misrepresentation, to parties in great distress, and ignorance of their rights. A bill had been filed, and dismissed on the plaintiff’s not appearing to prosecute it, which was a very strong act of acquiescence. The answer denied all misrepresentation, or that the defendant possessed any knowledge withheld from the plaintiffs. But all this was of no avail, when it appeared that the plaintiffs were poor and ignorant, and that the defendant had extracted conveyances for property, worth 5,0001. for about 1,0001. The chancellor said-, that this court protected on public principles, persons in distress, who, acting under the influence of that distress, though with knowledge of the circumstances, are to have the same protection as if they were entirely ignorant, being compelled by hard necessity.
The same doctrine is laid down by lord chancellor Redesdale, in Murray vs. Palmer, 2 Schoales and Lefroy, 474. He says that nothing will amount to a confirmation of a fraudulent transaction but an act done by the -party, after he has become fully aware of the transaction. He must at least be aware that the act he is doing, is to have the effect of confirming an impeachable transaction $ otherwise the act amounts to nothing as a confirmation,
The application of the doctrine of these cases, to which our reason assents, is conclusive on the case wo arc to decide upon. The Butlers thought themselves legally bound to go on and complete their ruinous bargain, •and therefore signed these papers, which are called con- *715 <ñrraatious; but which do not como under that character, as stated by the Judges; for they were not aware, that the original acts and contracts were impeachable, and. from which, they could be released. The papers executed, were a mere completion of the original agreements, By which they thought themselves bound; and not new and substantive acts of voluntary confirmation. Their ignorance and their necessities remained in fuil force.
I am, therefore, obliged to say, that they were not Bound by these last deeds, any more than by the first.
The few cases in which confirmations have been allowed to prevail, have been cases of the greatest fairness and deliberation, where very intelligent men-, fully aware of their rights and of their title to relief, have nevertheless thought proper to confirm contracts impeachable in their character, or of very doubtful character: And this after the necessity which led to the first bad bargain Bad ceased : such were the cases of Cole vs. Gibbons, 3 P. Wms. 290. Chesterfield vs. Janssen, 1 Atk. 314 to 354. Morse vs. Royal, 12 Vesey, 355, and some others* But these have no similarity to the case under our consideration.
Upon the whole, after a very long and laborious examination, and after the maturest deliberation, my judgment is clear that the complainants are entitled to relief, both on principle and on the authority of the decided cases ; because the inadequacy of price in these contracts was so gross as to shock the conscience, and raises that violent presumption against the correctness of the transaction, which amounts to intrinsic evidence. This coupled with the ignorance of the complainants, their necessitous situation in life, and their want ot full and correct information of their rights, and of the value of the property, makes a case of the highest claim to relief-Again, the defendant was the agent of the vendors to support and establish their claims to the estate ; and if the agent is allowed to become the purchaser at all, under any circumstances, from the cestui que use, it is of •the most imperious obligation on him to shew that the purchase was perfectly fair to all respects* and is not *716 liable to any sort of objection. But he has not done thisk for the objections of gross inadequacy of price, ignorance and necessity on the part of the vendor, and skill on the part of the purchaser, are made with irresistible force by the principals, against their agent, the purchaser. And finally, this very strong case is not weakened by the acts relied upon by the defendant as confirmations ; for the ignorance and necessity of the complainants remained, and they were not aware that the contracts could be impeached, and that they could be relieved — > what they did was in compliance and submission to the original contracts.
Henry W. Desaussure.